Case number 25-5660, NetChoice LLC v. Jonathan Skrmetti. Argument not to exceed 15 minutes per side. Ms. Murphy, you may proceed for the appellate. Good morning, Your Honors. Again, Erin Murphy on behalf of NetChoice. I thought I'd reserve three minutes for rebuttal, but it looks like maybe two, but either way is fine. So, we certainly think Tennessee's law is unconstitutional for all the same reasons as Ohio's. But, of course, the district court here never reached that question, because the court refused to consider our First Amendment arguments at all on the theory that NetChoice failed to identify any irreparable injury that Tennessee's law threatens to inflict. That conclusion is just unsustainable. This is not a case like the case the state points to where there's some uncertainty about how a law applies, whether it covers the plaintiff, that leads to questions about whether you're likely to enforce it in that context. The state doesn't dispute that its law regulates our members. To the contrary, it admits that they're the targets of this law. And it goes out of its way in its briefing to argue that our members are violating this law. In its view, they are violating this law. It argues repeatedly that it thinks they should be complying with this law. It is defending its law. And despite having numerous opportunities, including in its briefing before this court, the state has refused to disavow any intention even of starting to enforce this law against our members during the course of this litigation. Is your response on the provision that says, well, they've got to give 10 days notice, is your response, well, that's just a negligible time period? I've got multiple responses on that. I mean, for one, I think it would be quite extraordinary and pretty unfair to district courts to say, as long as there's 10 days, you should have to wait for the 10 days to come along. For another, I mean, I'd at least welcome it if the state stood up today and made clear something that's not clear in their briefs, which is whether they think that only means that we have 10 days to litigate a PI versus that they would wait and not file an enforcement action until the PI is resolved. But then the third piece of it is the whole point of bringing a PI is so you don't have to make that call between either surrendering your First Amendment rights, expending compliance costs, or just waiting to be sued. And so to say, sorry, you do have to make that choice. It's just that you'll have 10 days to bring a PI. Even if it was a 12-month notice period, your position's the same? It is. I mean, there's cases where courts have said, we cited cases in our brief where they've said, even six months, whatever it is, I mean, that gives the district court more time to work on the PI. But it's sort of unusual to say, no, no, no, we want you to wait until there's very little time to resolve the PI, especially when you've got the state turning around and complaining that they thought we didn't bring this early enough. So it really seems like there's sort of just an oddity here of, unfortunately, the district court took a very long time to resolve our PIs, so we have a period during which the law was in force yet wasn't enforced. But I don't think that that alone is enough to say we can't bring a PI. And really, the district court seems to have said below that unless the state affirmatively says we plan to sue you, you don't have the imminent threat of an enforcement action that you need for a PI. I mean, not only is that inconsistent with any case that we have looked at, it would create terrible, terrible incentives for cases, particularly cases challenging government laws. Because if the government can defeat a PI by just not admitting exactly when it plans to bring suit, by saying, yeah, yeah, we might sue you, we may well sue you, we may well sue you at any time during this litigation, but we won't tell the court exactly when or where we might do that. I mean, you'd never be able to get a PI. What have they said in this case in terms of when they might take action or bring suit? What have they said here? All we've gotten from them, other than that they won't agree to not sue during the course of the lawsuit, is that they said for the first time in their briefing in this court that they won't do it without at least supplying the 10 days notice. But that's kind of all we got. And I think that that goes to show why it really doesn't make sense to say, well, come back and seek a PI that you want the district court to resolve in 10 days. We did what litigants are supposed to do when they think there's a law that implicates their First Amendment rights and that is forcing them to undertake compliance costs. We brought suit before that law took effect. We asked for relief before that law took effect so that we wouldn't find ourselves in the situation we are now, where there's a law hanging over our heads that implicates our First Amendment rights, that imposes compliance costs, and that the state is unwilling to say it wouldn't enforce against us and is, in fact, defending on the merits. You know, that's precisely the kind of circumstances where you're supposed to be able to seek preliminary relief. So we think the district court was wrong to not reach the merits of our First Amendment arguments here, in part because to the extent the district court was suggesting that there is no First Amendment injury here, that really rested entirely on its imminence argument, not on anything about the merits. We think the district court was wrong about the compliance costs issue, too. We read it as taking the side of the courts that have said that compliance costs are sufficient irreparable injury. So we have irreparable injury just in all of the classic senses here. And once you resolve the First Amendment claims, you know, then if we're right about those, we have irreparable injury under the basic rule that if you are asserting a violation of your First Amendment rights, then you have irreparable injury. And here, too, just as we were engaging in a little bit earlier, the role of the rights of users, I mean, while we certainly do think that this law implicates the rights of users and we think that the district courts are free, as the court in the Ohio case did, to take those interests into account in the irreparable injury analysis, they're not essential to our irreparable injury arguments because we've asserted our own First Amendment rights. And, indeed, we have members who have, in fact, stopped providing their services to minors in the state of Tennessee precisely because of this law. So we don't just have, you know, the possibility of First Amendment injury. We have First Amendment injury members who have a First Amendment right to disseminate speech to minor users and are unable to do so because of this law. Let's get to the merits because, you know, I guess one question I have, I have a lot of questions about these cases, but is whether both of these district courts could have gotten it right. And to that point, is there a meaningful difference here in Tennessee on the coverage provision? I mean, it's a very different umbrella, to use my prior metaphor, right? It basically says, you know, platforms that use posts, or, you know, you can correct my language. Isn't that different? How is that? The coverage is a little different, but I think it clearly implicates the First Amendment, nevertheless, since it is applying to services where you can create an account that, quote, enables an account holder to communicate with other account holders and users through posts. So the state has told you we're only concerned with services where users engage in First Amendment activity. And, in fact, much like Ohio did, the state actually addressed some of the Supreme Court's concerns in Moody by carving out some other types of services. For instance, Tennessee's law doesn't apply to e-mail services or broadband Internet services. So the state kind of made clear, we want to be sure. We actually are focused on this. And then you have exemptions. Some of those are clearly, I mean, all of them are content-based, and I'm happy to talk about that. But I would also note some of them are designed to kind of carve out some of the things the Supreme Court was focused on in Moody. One in particular is for peer-to-peer payment services, which is something that came up in the Moody argument. And so I take Tennessee to have said, you know, we kind of want to make sure our law doesn't apply to some services that might have some speech but are actually providing something that is kind of a non-speech product, where, yes, there's speech because you've got to tell somebody what you're paying them for, but maybe it's not the more traditional form. So I think this law, too, the coverage definition ensures that it implicates speech all the time. And I actually think it's even, you know, I mean, don't get me wrong. I think both laws are clearly content-based. But this one's even more obviously. I think it's an even easier call here. I mean, there's a definition of content in this law, and the definition excludes from content educational entertainment. I don't see how you could try and pitch that as having anything to do with the nature of the features. It could be a service where it's 100% user-generated activity, and by virtue of that exclusion, you would not be covered as long as the service chose to focus it on educational entertainment. Now, of course, there's other exemptions here, including an overarching exemption for any service where content is preselected by the service. And courts have repeatedly held that that itself is a content-based distinction because it's basically saying, look, we trust it a little bit more. If you're talking amongst yourselves about content preselected by the New York Times or ESPN, but, you know, once you're talking about somebody's post on Facebook about what they think about the news of the day, we just start to worry a little bit more about what kind of conversations might ensue. And again, we see that that concern with content is evident in the defense of the law offered by the state, which focuses not just on concerns about account creation or contracting or any of that, but concerns about what kind of content minors might encounter on services, what kind of speech they might engage in, whether they might be drawn in in a way where they want to spend more time engaging with speech on these services. So in the context of services that have constitutionally protected speech, we think all of that makes it very clear that we have a law that implicates the First Amendment, a law that gets strict scrutiny, and a law that cannot pass strict scrutiny, and really can't even pass intermediate scrutiny, since the defenses here are pretty similar to ones where the Supreme Court has already said, these aren't permissible ways of advancing your interests. I mean, Brown really takes off the table the idea that you advance parental authority by saying, well, we'll just ban minors from accessing speech unless and until their parents say it's okay. The age verification piece is a little different than that, though, isn't it? I mean, that's not something we had in the Ohio case. It's a little bit different. You have the Free Speech Coalition case. Free Speech Coalition tells us there's no question that the age verification implicates the First Amendment. It also says there's no First Amendment right. Adults don't have a First Amendment right. They don't have a First Amendment right as to speech that is not protected vis-a-vis minors. When you look at the language in Paxton, every time they say it, they include that language, that they're only talking about whether adults have a right to access that particular subset of speech because that particular subset is not protected as to minors. So the court made clear it understood that it was dealing with a content-based distinction in Paxton. That was the whole debate between the majority and the dissent. No one disputed that it was a content-based distinction. It was just a very different case because it's a content-based distinction where the content, the universe of content at issue is not constitutionally protected as to minors. Of course, here no one has ever argued that all of the speech on these services is not constitutionally protected as to minors. So I think Paxton actually helps us both because it makes clear that you get scrutiny. It makes clear that strict scrutiny is practically impossible to satisfy. And on top of that, it makes clear that intermediate scrutiny not only asks whether a law advances your interest but asks whether it does so in a way that avoids abridging more speech than necessary to do so. And that's the fundamental problem with this law. Any interest that's asserted in defense of it is not an interest that's sufficient to justify the sweeping approach of saying, we'll ban minors from accessing any of this constitutionally protected speech unless and until their parents provide consent in a manner that Tennessee deems appropriate. Unless there are questions right now, I'm happy to reserve the remainder of my time for Roberto. All right. Thank you, Your Honor. And may it please the Court, Matt Rice on behalf of Attorney General Scarametti in the state of Tennessee. The district court did not abuse its discretion here. It denied preliminary relief, but it instructed that choice to come back and file a renewed motion if the Attorney General provided the 10-day notice needed to initiate an enforcement action. That is not an abuse of discretion. It's an exercise of it. Your Honor, there was some statements by my friend that this is unfair to the district court to have to come back and decide this P.I. within the scope of 10 days. Your Honor, the district court itself was the one that suggested that net choice come back and file a renewed motion. So I think the question before this court isn't whether this court thinks that 10 days is enough time or not. It's whether the district court in saying you can come back and file a renewed motion, whether it abused its discretion in doing so. I heard my friend say that her position would be the same even if the notice period was one year long. I think that there's no case law that suggests that a one-year period before there could be an enforcement action is sufficiently imminent to justify a preliminary injunction. And would your position be the same if it was a four-hour notice period? Well, Your Honor, I think that we're not trying to set a specific time frame, 10 days versus 12 months. I think this is where the abuse of discretion standard comes in, and this is where the district court telling them they can come back and file a renewed motion. I think the question before this court is, is this an abuse of discretion? If he had said 10 days is not enough time, I don't know that that would have been an abuse of discretion, Your Honor. And so I think that our position turns on the standard and the district court telling them that they can come back. Now, I guess there's multiple forms of irreparable harm that my friends try to assert here. There's the imminent threat of enforcement, which is one form, and there's also their claim that their members are at this moment suffering irreparable harm. I think that argument also has a couple problems. One, to show First Amendment harm for their members, that's dream with and next door. They must actually show that dream with and next door are engaged in protected expression, and we don't think that they have shown that here, Your Honor. Our friends, both in making their facial argument and in making this argument, that their current members are suffering irreparable harm, they seem to equate the notion with disseminating third-party speech with disseminating their own speech. I don't think you can read any of the separate writings or the majority opinion in Moody to suggest that there is a First Amendment-protected right in disseminating user speech if you yourself are not speaking. None of the opinions in Moody suggest that in Rumsfeld v. Fair, the Supreme Court indicated that merely hosting third-party speech is not itself protected activity. The Ninth Circuit in Bonta drew a distinction between hosting speech and you yourself engaging in protected editorial discretion. And that, I think that not only sinks the claim that their current members, dream with and next door, are suffering harm right now. I think that also undercuts their facial challenge argument. And if I could try to address some of the questions that Your Honor brought up. Let me stay on this for a moment, the compliance costs question. If you later tried to enforce and this was found to be unconstitutional, could they sue the state to get this money back or are you immune? A few things, Your Honor, on compliance costs. One, we think there's a proof problem. The district court noted that they haven't presented proof. On the high PI standard, they have to make a clear showing. They did not make the clear showing with proof of their compliance costs. Two, we think in this context, this tees up, I think, a very tricky issue, which is compliance costs and the difference between an Ex Parte Young action brought under 1983 against a state official and an APA action where there's an explicit waiver of sovereign immunity that's brought against a federal official. We think those differ in a couple different ways, Your Honor. One is the nature of what can be challenged. In an APA challenge, you can challenge the rule itself, the promulgation of the rule. In an Ex Parte Young action, that's not the case. You can't challenge the existence of a rule. You have to challenge a particular action by a state official. So if they were going to show compliance costs, it couldn't stem from the law itself. It would have to stem from action taken by General Scrimeti, and they haven't shown that. The other difference, as Your Honor alluded to, is that against the feds, there is no ability to obtain damages ever. That's not the case with respect to the state. We are glad to have them concede that they cannot recover damages against the state, but if they don't want to make that concession, then there's no argument that that's unrecoverable. We took them to make that concession in their reply brief. Your Honor, if I could briefly touch on the facial challenge, because I don't think it's as simple as the umbrella. If this is content-based, everything falls within it. And if I can start with social media websites that contain pornography. So there are numerous social media websites that contain pornographic material. It's obviously lawful for the state to regulate that under Paxton. Now, my friends on the other side say, well, there's another Tennessee law that covers pornographic websites and doesn't allow minors to access those websites. The problem is that Tennessee law only covers websites that have 33% or more of pornographic material. There are a number of social media platforms. A big example is X. X has a substantial amount of pornographic material on it. It does not, I don't think, have 33%, but that's again, we don't have that in front of this court. They haven't made the showing as to what percentage of X's materials are pornographic, or Instagram, or Facebook, or any of these cases. I understand the point you're making about the facial challenge. Do I understand, though, that in this case at least, there is an as-applied challenge also, or do you dispute that? I think we do dispute that they've raised it, Your Honor. I mean, typically when you have an as-applied challenge, you raise the specific facts for an individual party and how they have, what their rights are, how those rights have been burdened, and then you go through the steps. They did not do that on an individual basis in their briefing to this court. We have a pending motion to dismiss at the district court arguing that the association doesn't have standing to assert the as-applied claims. We're not challenging their standing to assert the facial claims. But for as-applied claims, the Supreme Court in Hunt was clear that you can't have an association asserting on behalf of particular members if the resolution of the legal issue would determine on the specifics of those particular members, and we have a pending motion to dismiss with respect to that. You concede they raised it below, but you're not necessarily conceding they briefed it adequately here. I don't think that they briefed it adequately here, Your Honor. The other thing that I want to go back, because we think that, one, this notion that you can just have this umbrella and everything that falls underneath it kind of wipes away the facial challenge. I think the pornography is one problem for that, websites that contain pornography. I think another problem is the only way that they get there to this notion that, oh, well, if it's content-based and it's content-based for everyone, is because they're equating their right to speak themselves with the right to disseminate third-party speech. And, again, we don't think that the Supreme Court has ever said, like, AT&T doesn't have a First Amendment right in its phone lines to keep phone lines open for people to talk about. If they themselves are not speaking, then there's no First Amendment problem. And so that's why we think that the court has to go platform by platform to see, well, is this platform engaging protected expression? So we do think this circles back, and it is exactly the same position that Net Choice was in at the Supreme Court, where it takes these vague First Amendment principles without going through each social media platform and without showing how each platform speaks, and it claims that we've made out a facial claim. And we do not think that that is a viable basis for asserting a facial challenge. Your Honor, I want to touch on, we do think our law is different from Ohio's. Our law does not reference subject matter, for example. And Your Honor raised this, and I want to come back to it, which is we do think that our law, that the proper corollary here, even if this court thought that our law was content-based, the proper corollary would be Paxton. And we think that there are similarities and differences, but we think for purposes of the legal analysis they are similar because in Paxton what you had is you had the regulation of some unprotected activity. So their minors did not have First Amendment rights to access pornography. It imposed some incidental burden on other speech rights, the adults who have to show an ID. And it did so through an age verification requirement. And the court said, look, one, an age verification requirement is not somehow, you're not protected against that under the First Amendment. And two, you're imposing an incidental burden through that age verification requirement, but it's in the course of regulating something that's unprotected. We think we're doing the same thing here because we are regulating something that's unprotected, which is just the account creation. We are not regulating access to the speech. My friend keeps wanting to equate this to regulating access to speech so that they can cue their position closer to Brown. But the test can't be that any time there's an impediment on your ability to access speech that there is necessarily a problem and you have to immediately go to Brown, or any type of age verification is necessarily you immediately go to Brown. I think there is a spectrum where you have Brown, which was a complete bar on access, and you have, for example, a sales tax, which is a minimal burden that is added on. And we just think that our law is closer to the sales tax than it is to Brown because we're not preventing minors from accessing this. The only thing that's preventing minors from accessing are the social media platforms' desire to maintain their ability to exploit kids through lopsided legal contracts. That may be their preferred business model, but that is not a protected First Amendment right. I mean, these contracts require kids to waive all liability. They give away their personal information. They give away their name, image, likeness. They agree to form selection clauses. That is what we're regulating. And just because social media platforms would prefer to have kids continue to enter into these agreements, that doesn't mean we're putting a ban on access. The only thing that's banning access is their insistence that kids enter into these agreements or not get on their social media platforms. And again, it's not even not get on their social media platforms. Kids can access these sites without an account, and they do. Kids get on YouTube without an account. You can get on X without an account. There are any number of different platforms that allow you to access their services without entering into an agreement. And again, this goes back to the facial challenge. I do think that it differs based on platform. It turns on the facts. And, Your Honor, I don't think that all of that can be swept away through kind of an umbrella, this is content-based. That would conflict with what the Fifth and Ninth Circuits have done because both the Fifth and the Ninth ruled against net choice, and they did so on facial grounds. The Eleventh obviously didn't do so on facial grounds. It held against them under intermediate scrutiny. Your Honor, even if this court agrees with net choice on irreparable harm, we don't think that that's right. We think the easiest way to get rid of this case is just to affirm and say the district court did not abuse its discretion. But even if this court agrees with net choice on irreparable harm and has some questions about the merits, we do think that the court should nonetheless just remand this case to the district court. One, the Supreme Court left Mississippi's materially similar law in place in Fitch, and the Supreme Court later made clear in Boyle that while an interim order is not conclusive, it does guide lower courts in the use of their equitable discretion. We should just ignore, I guess, Justice Kavanaugh's statement. Well, I mean, I think, well, one, it was only written for Justice Kavanaugh, but for two, and I think the lack of joins is indicative, but for two, Justice Kavanaugh himself voted to keep the law in place. He said the equities here are not comparable, so there should not be a preliminary injunction. And we think the district court should have the opportunity to weigh those equities in the first instance. I mean, on the one hand, we've got multibillion-dollar corporations who are struggling to come up with a concrete harm, either compliance costs or a speculative First Amendment harm. And on the other hand, we have kids that are being harmed. I don't think that balance is particularly close. I mean, the suicide rate is up 64 percent. The self-harm for girls 10 to 14 years old is up 281 percent. I think the balance of the equities weighs in one direction here, and it weighs against net choice as the Fifth Circuit has found, as the Ninth Circuit has found, as the Supreme Court has found, and as the Eleventh Circuit has found. But you're not saying that we should be making that determination now. No, Your Honor. I think this court should remand and allow the district court to do that in the first instance. If I can give one more pitch for why remand would be appropriate, the injunctive relief has to be tailored. And that means, one, any injunction needs to be party-specific. We think they have a problem that even if there was an injunction, and even if you accept their argument regarding Dream With and Next Door, that only the parties that have actually shown irreparable harm can get injunctive relief. You can't parlay an injury to Next Door, which no kids are on, to get an injunction for Facebook. Second, Your Honor, any injunction needs to be limited to the constitutional problem. There are multiple provisions. For example, the parental supervision provision in Section 5704, separate provision, separate requirements. They have not made out a case as to why that requirement is unconstitutional, nor could they, because Brown itself indicates that, quote, the state has the power to enforce parental prohibitions. I see that I'm out of time, Your Honor, if there are no further questions. Apparently not. Thank you, Your Honor. Great rebuttal. Thank you, Your Honor. Just a few points. First, we heard some discussion about abuse of discretion, but I do want to be clear. The district court didn't consider all the factors and decide in a matter of discretion that we were entitled to relief. The court held as a matter of law, in fact, that we did not establish any irreparable injury and that it therefore didn't need to consider anything else in the preliminary injunction analysis. And we think that that is wrong as a matter of law. It's an abuse of discretion, and it's inconsistent with the factual record here. You have to show the irreparable and imminent injury. Yes, but in the context of the kind of showing here, I mean, if you look at Susan B. Anthony's list, the test the court was laying out there, they used the word imminent. So I think the standing inquiry and the imminent inquiry when it comes to a pre-enforcement challenge are one and the same. It's just a matter of showing that you have a colorable threat of enforcement, and we think we easily clear that bar. We also, you know, I heard the state today really just seem to suggest that we didn't prove up exactly what our compliance costs are. I mean, that's not relevant. Well, yeah, this court said in Biden, that may be relevant if you go on to the step of weighing the balance of the equities, but it doesn't mean you don't have any, and I don't see how anyone could dispute that it would require compliance costs to come into compliance with this law, when, as Tennessee itself has pointed out, these are things that our services, many of them, are not currently doing. So we have that. And then, really, we have clearly a First Amendment injury that we've asserted. I have to say it's a little surreal for me to hear the state say that they don't think that Moody addressed the question of whether a service is engaged in First Amendment activity when it's disseminating the speech of third-party users. That's what the question was in Moody, and I represented Net Choice in Moody. That's what the case was all about. And the whole second half of the court's analysis, when it's engaging in why Facebook and YouTube have First Amendment rights, is explaining why, when you are engaging and curating and exercising editorial discretion to say, we're going to allow some speech but not other speech on our services, we're going to present it in particular ways, that that is itself First Amendment activity, even if the posts, the content that you're deciding whether to disseminate or not, weren't originated, weren't generated by the service itself. So we have that exact same injury here and exact same members here that are covered by this law and have the same First Amendment rights here that they did there, which is itself another First Amendment injury. Now, we're not going to resist too hard that there may be some issues that need to be resolved on remand, but we do think it would be extremely valuable, especially since we waited nearly eight months, even to just have a decision that refused to consider our arguments at the PI stage, for this court to provide some guidance on the aspects of this law that we think are indistinguishable from Ohio's law, principally the parental consent requirement that is virtually identical to what was going on in Brown, where the court, what the state had said, is you can't access speech without your parents' permission. I don't see how that could survive Brown. And since the age verification here is incidental to that unconstitutional effort to restrict speech, it's unconstitutional as well. We'd ask the court to reverse. All right. Thank you. Case is submitted.